**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Steven C. STREEBING, Defendant–
Appellant.**

No. 92–1154.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 28, 1993.

Decided March 2, 1993.

Jennifer J. Peregord (argued and briefed), Office of U.S. Atty., Detroit, MI, for plaintiff-appellee.

Edward Wishnow (argued and briefed), Southfield, MI, for defendant-appellant.

Before: KENNEDY and GUY, Circuit Judges; and BROWN, Senior Circuit Judge.

KENNEDY, Circuit Judge.

Defendant Steven C. Streebing appeals his jury conviction and sentence for mail fraud and for making false and material statements and representations on applications he submitted to the Social Security Administration for disability insurance benefits. The following issues are raised on appeal: (1) whether the District Court erred in failing to utilize its supervisory powers to dismiss the indictment in light of the government's alleged promise not to indict the defendant if he cooperated; and (2) whether the District Court erred in imposing restitution based on the entire mail fraud scheme in the absence of a finding of guilty for each of the mailings pursuant to that scheme. For the reasons set forth below, the defendant's convictions are affirmed, the restitution component of the sentence is vacated in part, and this case remanded for resentencing.

## I.

On October 8, 1985, defendant, an employee of General Dynamics Land Systems ("General Dynamics"), was temporarily reassigned from his engineering position to the production area of the plant. Citing fears evoked by reason of a previous injury, defendant told the occupational health nurse that he did not want to work in tool and die. Defendant was sent home that same day when he said he was sick. Claiming total disability due to depression and other psychological problems caused by the job reassignment, defendant applied for, and began receiving, sickness and accident benefits (SAB) from General Dynamics.[1] From November 1985 to April 1986, defendant received approximately $7,439.90 in sickness and accident benefits from Aetna Insurance Company, General Dynamics' insurance carrier. Defendant also applied for and began receiving long-term disability (LTD). From April 1986 to January 1989, defendant received approximately $43,261.54 in long-term disability benefits from Aetna.

In May of 1986, defendant applied for social security disability benefits and filled out a social security disability report. The application for disability asked the applicant to enter the names and addresses of all persons, companies, and agencies for whom the applicant had worked "this year, last year, and the year before." Defendant's answer was "General Dynamics." The application also asked whether the applicant was "self-employed this year, last year, or the year before." Defendant responded "no." Defendant's application was denied, and on October 23, 1987, defendant made out another application for social security benefits and an accompanying disability report. His answers to the questions pertaining to his employment activity were the same as on the first application.

Again defendant's request was denied. After filling out another application in December of 1987, defendant was finally awarded social security benefits. Between December of 1987 and August of 1989, defendant received social security benefits totalling $14,115.00.

The evidence adduced at trial showed that shortly after defendant began receiving sickness and accident benefits from Aetna, he formed a corporation, Valhala Music, to create and market computer software for the music industry. Defendant was president of the corporation and owned 51% of its stock. During the entire time that defendant was receiving long-term disability and social security benefits, he was actively involved in the operations of Valhala, including creating, advertising, and marketing the software. The corporation was operated out of defendant's home for which Valhala paid a substantial portion of the upkeep and expenses.[2]

On April 26, 1991, defendant was charged with nine counts of mail fraud and three counts of making false statements in connection with an alleged scheme to defraud the Social Security Administration and Aetna Life Insurance Company of disability benefits. On August 24, 1989, about a year and eight months before this indictment was returned, defendant was interviewed at his home by an agent from the Federal Bureau of Investigation, an investigator for the Department of Health and Human Services, and an investigator for General Dynamics. This interview was conducted as part of the investigation into what appeared to be defendant's falsification of his status as totally disabled. The first hour and one half of the interview was videotaped by defendant.

The recording establishes that during the interview, defendant made inculpatory statements and admissions with respect to

---

1. Regarding its sickness and accident benefits and long term disability benefits, General Dynamics' group insurance booklet explained that:
   During the first 18 months of disability, you are considered totally disabled if you cannot do your normal job because of illness or injury. After that period, you are considered totally disabled if you cannot work for pay or

profit at any job for which you are, or could reasonably become, fitted by education, training or experience. You must be under the care of a physician at all times and not be working for pay or profit.

2. The indictment indicates that defendant did not draw a salary from the corporation.

activities charged in the indictment. Prior to trial, defendant filed a motion to dismiss the indictment alleging that the FBI agent told defendant "both directly and impliedly that if he cooperated and made a statement and told the agent what he wanted to hear, there would be no prosecution and there would [be] no indictment." The District Court denied the motion.

At trial, defendant was acquitted on Counts 1, 3, 4 and 5, and was found guilty on four mail fraud counts (8, 9, 11 and 12) and on three counts of making false statements to the Social Security Administration (2, 6, and 7).[3] On January 24, 1992, defendant was sentenced to concurrent terms of five (5) months imprisonment on each count, three (3) years supervised release, and was ordered to make restitution to Aetna and the Social Security Administration in the amount of $64,816.44. This timely appeal followed.

## II.

### Dismissal of the Indictment

■ Defendant first argues that the District Court erred in failing to dismiss the indictment. Defendant contends that during the course of the August 24, 1989 interview, a special agent of the FBI promised the defendant he would not be prosecuted if he cooperated in making a statement. During the course of the taped portion of the interview between defendant and the investigators, the following exchange took place:

> JAY SIEGER (FBI): Ok, then, if you want to resolve it, when this man [referring to John Pollock of HHS] asks you why you put none [referring to Streebing's answer to a question about his earnings or self-employment income on his social security application forms], then you gotta tell him—I put none because I knew if I would have put something down there I wouldn't have got the benefits. That's what you gotta tell him.
> JOHN POLLOCK (HHS): And not
> STREEBING: And then it won't go to court? And then

> POLLOCK: No, let me put, let me put
> STREEBING: I just reimburse you guys, or whatever? or ah
> POLLOCK: Steve, your gonna reimburse us, ok
> STREEBING: Can I, but will I be able to do it without going to court? or will
> POLLOCK: I don't know that, I'm not a jury. All I am is an investigator.
> SIEGER: *You're not gonna be indicted, you're not going to be indicted.* Ok, if we go back to the United States Attorney's office and we tell him, here's what we did, we went out and talked to this guy, he acknowledged what he did, he acknowledged violating federal law, ok, now Mr. Prosecutor, do you want to prosecute this man or not, that's gonna be his decision. If I go to him, after I, if you let me walk out of here today, and I go out and prove what I know we can prove, I'll guarantee you what will happen when we walk out with him. *You're gonna be prosecuted one way or another,* Steve, you're gonna have to face that, ok. You're either gonna be, we're either gonna go and ask for an indictment against you, or you're gonna come down and resolve it prior to that time. By your telling us what you're telling me today, and John today, is that you don't want to resolve it at this time. You'd rather wait until after charges are brought against you and then resolve it.

(Emphasis added). Defendant maintains that because he cooperated, the government was obligated to fulfill its part of the bargain and because it did not, the District Court should have dismissed the indictment.

■ The power of a district court to dismiss a grand jury indictment under the supervisory powers doctrine is premised on the inherent ability of the federal courts to formulate procedural rules not specifically required by the Constitution or Congress to supervise the administration of justice. *See United States v. Isgro,* 974 F.2d 1091, 1094 (9th Cir.1992); *United States v. Talbot,* 825 F.2d 991, 998 (6th Cir.1987), *cert.*

---

**3.** The government dismissed Count 10 during trial.

*denied,* 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 860 (1990) (the courts retain inherent supervisory authority over the law enforcement processes which culminates in the criminal proceedings brought before them). In order to invoke this power, a court must first find that the defendant is actually prejudiced by the misconduct. *Id.* In accepting the magistrate judge's report and recommendation that the indictment in this case should not be dismissed, the District Court stated:

> As [the] Magistrate ... correctly noted in his Report and Recommendation, the court should not dismiss an indictment absent a showing that defendant "was demonstrably prejudiced by the violation." *United States v. Talbot,* 825 F.2d 991, 998 (6th Cir.1987). Even assuming the FBI agent told defendant he would not be prosecuted if he cooperated (an assertion which the government strongly contests) dismissal of the indictment is a drastic remedy, which is appropriate only in truly egregious cases. *See United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1980 [1981]). Defendant has failed to show any such prejudice in this case.

The District Court based its decision that there was no prejudice on the government's stipulation that none of the statements made by defendant at the interview with the agents would be used at trial, as well as the Assistant United States Attorney's representation to the District Court that none of these statements were presented to the grand jury. We agree with the District Court that the indictment should not be dismissed for prosecutorial misconduct. The defendant was not prejudiced.

■ Defendant also argues for dismissal of the indictment based upon the government's alleged breach of promise not to prosecute. In *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), the Supreme Court held that when the government makes promises to a defendant who relies on those promises and pleads guilty, the government must carry out its representations. Because defendant did not plead guilty, the facts here are not governed by *Santobello.* However, a cooperation agreement is analogous to a plea bargain agreement. *United States v. Carrillo,* 709 F.2d 35, 36 (9th Cir.1983). Consequently, several courts have acknowledged that the principles of *Santobello* apply whenever a defendant acts to his detriment in reliance upon governmental promises. *See, e.g., Carrillo,* 709 F.2d 35 (upholding dismissal of the indictment when DEA agents breached promise not to prosecute if defendant cooperated with government's investigation of suspected drug traffickers); *United States v. Rodman,* 519 F.2d 1058 (1st Cir.1975) (requiring dismissal of an indictment when SEC breached agreement to make no prosecution recommendation to United States Attorney in return for defendant's cooperation).[4]

■ The relevant case law also makes clear, however, that while "[a]s a general rule, fundamental fairness requires that promises made during plea-bargaining and analogous contexts be respected," *Johnson v. Lumpkin,* 769 F.2d 630, 633 (9th Cir. 1985), this rule is subject to two conditions: (1) the agent must be authorized to make the promise; and (2) the defendant must rely to his detriment on the promise. *Id. See also United States v. Kettering,* 861 F.2d 675 (11th Cir.1988). Even assuming, *arguendo,* that the exchange between defendant and FBI agent Sieger constituted a promise not to prosecute defendant if he cooperated, defendant has failed to satisfy either requirement of this test.

First, the record is devoid of any evidence establishing that FBI agent Sieger

---

**4.** In *Rodman,* the SEC promised to recommend that the United States Attorney's office not prosecute Rodman if he would cooperate with an SEC investigation. Although Rodman provided substantial information, including self-incriminating statements, in reliance on the agreement, the SEC failed to make the promised recommendation. Not only did the official fail to make such a recommendation, but at the time of the statements he was actively contemplating the preparation of a criminal reference report which would have included the defendant. The Court of Appeals held the district court did not abuse its supervisory powers by dismissing the indictment for unfairness.

was authorized to make promises or representations to induce defendant's cooperation. Moreover, during the course of the interview, the agent stated that defendant "was gonna be prosecuted one way or another" and that the final decision on the manner of defendant's prosecution rested with the United States Attorney's office. At no time did the United States Attorney ever offer defendant immunity from prosecution.[5] Therefore, because the FBI agent lacked any actual or apparent authority to make the alleged promise not to prosecute, the District Court did not err in failing to dismiss the indictment. *See Kettering*, 861 F.2d at 678 (DEA agent never authorized by the Assistant United States Attorney to enter plea agreement with defendant and thus plea agreement unenforceable); *Lumpkin*, 769 F.2d at 634 (court held that a promise by federal agents that defendant would serve no time on state charges if he cooperated in the federal investigation was unauthorized); *United States v. Hudson*, 609 F.2d 1326, 1329 (9th Cir.1979) (court held that fundamental fairness concerns did not require the United States Attorney to abide by a secret service agent's promise to a defendant to drop federal counterfeit charges in exchange for defendant's cooperation in the case where the United States Attorney never sanctioned the agreement and promise clearly outside the agent's authority).

Second, defendant did not rely to his detriment upon the alleged promise not to prosecute. It is undisputed that the government did not use any of the information obtained from defendant during the interview against him in any subsequent proceeding nor did it present the information to the grand jury. Consequently, defendant was in no worse a position at the time

of trial than he was at any time prior to or after the interview, and as such, he suffered neither prejudice nor detrimental reliance. Accordingly, he is not entitled to specific performance of the alleged cooperation agreement.

In *United States v. Williams*, 780 F.2d 802, 803 (9th Cir.1986), the Ninth Circuit stated that:

In general, a promise made by a government employee other than the United States Attorney to recommend dismissal of an indictment cannot bind the United States Attorney. An exception has been recognized where, although the United States Attorney was not a party to a cooperation agreement, breach of the agreement rendered a prosecution fundamentally unfair.

(citation omitted). Promises by federal agents that a defendant will not be indicted are analogous to promises to recommend dismissal of an indictment. Thus, because the prosecution in the case at hand was not fundamentally unfair, the District Court did not err in failing to impose the drastic remedy of dismissal of the indictment.

## III.

### Restitution

In pertinent part, the Victim and Witness Protection Act ("VWPA") provides:

The court, when sentencing a defendant convicted of an offense under this title ... may order, in addition to or ... in lieu of any other penalty authorized by law, that the defendant make restitution to any victim of such offense.

18 U.S.C. § 3663(a)(1) (1988). Defendant argues that the amount of restitution ordered by the District Court, $64,816.44,[6]

---

5. In fact, the government points out the absurdity of their promising to let a defendant go free of any punishment for a crime he commits merely because he admits his guilt.

6. This figure represents the total amount of all Aetna SAB, Aetna LTD and SSA benefits paid to defendant from November 1986 to September 1989. The district judge, however, used a different amount for sentencing purposes. He used the $39,296.42 amount, representing the total amount of Aetna LTD benefits ($25,181.42) and

SSA benefits ($14,115.00) paid to defendant between April 1987 and January 1989. This amount excludes benefits defendant received from Aetna prior to March 1987. Defendant was acquitted on all mail fraud counts involving checks paid by Aetna to defendant prior to March 1987. These acquittals were indicative of a finding by the jury that defendant may have met the requirements for disability benefits during the first 18 months following his separation from the company in October of 1985. The sentencing court, however, found that the evi-

was impermissible under the terms of the VWPA and in light of the Supreme Court's interpretation of the Act in *Hughey v. United States*, 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990) as well as this Court's recent decision in *United States v. Jewett*, 978 F.2d 248 (6th Cir.1992). In *Hughey*, defendant was charged with three counts of theft by a postal service employee and three counts of unauthorized use of credit cards. Hughey pled guilty to one count of unauthorized use of a single credit card. Count 4 alleged that "on or about October 18, 1985, ... [Hughey] did knowingly and with intent to defraud use an unauthorized [MBank Mastercard credit card] issued to Hershey Godfrey...." *Hughey*, 495 U.S. at 413–14, 110 S.Ct. at 1981. Hughey was ordered to pay restitution of $90,431, the total of MBank's losses relating to Hughey's alleged theft and use of 21 credit cards issued by MBank to various cardholders, even though MBank lost only $10,412 as the result of Hughey's unauthorized use of the Godfrey credit card. At issue was whether the VWPA "allow[s] a court to order a defendant who is charged with multiple offenses but who is convicted of only one offense to make restitution for losses related to the other alleged offenses." *Id.* at 412–13, 110 S.Ct. at 1981. The Court held that the Act "authorize[s] an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction." *Id.* at 413, 110 S.Ct. at 1981.

### A. False Statements

■ It is undisputed that non-human entities such as the Social Security Administration can be "victims" entitled to restitution under section 3663. *See, e.g., United States v. Durham*, 755 F.2d 511 (6th Cir. 1985). Defendant was indicted on three counts of knowingly and willfully making false statements of material facts,

> that is, STREEBING stated and represented in an application to the Social

Security Administration for disability insurance benefits that he had been unable to work since October 7, 1985 because of severe depression, that he had last worked for General Dynamics, and that he was not self-employed, whereas in truth STREEBING was the president of and was running his own company, Valhala Music, Inc.; all in violation of Title 18, United States Code, Section 1001.[7]

Defendant was found guilty on all three counts of making false statements. Accordingly, because the VWPA allows restitution for the "loss caused by the specific conduct that is the basis of the offense of conviction," *Hughey*, 495 U.S. at 413, 110 S.Ct. at 1981, the Social Security Administration is entitled to the full $14,115.00 that it paid to defendant between April 1987 and January 1989. These payments were all issued as a result of defendant's false statements on his application for disability.

### B. Mail Fraud

■ This Court has addressed the application of *Hughey* in a case involving convictions for mail fraud in *United States v. Jewett*, 978 F.2d 248 (6th Cir.1992). Both parties concede that the decision in *Jewett* is dispositive and binding on this Court. Jewett was employed as a consultant to Arc Rubber, Inc. In a nine-count mail fraud indictment, the government alleged that Jewett and the president of Arc Rubber secured Ford business through kickbacks paid to a Ford employee, Schafer, who "steered Ford business to Arc Rubber." Between February 1984 and March 1989, Arc Rubber issued checks for approximately $650,000 to Interglobal Consultants, a business name assumed by Schafer to receive kickbacks.

Jewett pled guilty to Counts I and II of the indictment in exchange for the government dismissing all other counts. Count I set forth fully Jewett's fraudulent scheme and referred specifically to a $44,924 check Jewett caused to be mailed for the purpose

---

dence demonstrated by at least a preponderance that defendant was engaged in a scheme to defraud Aetna from as early as the beginning of his disability, and thus used the full $64,816.44 figure for restitution purposes.

7. Defendant filled out three applications for benefits and these applications formed the basis of the three counts.

of executing his scheme. Count II incorporated by reference the description of the scheme and referred specifically to another check in the amount of $24,054.60 mailed by Ford to Arc Rubber. The sentencing court, pursuant to the VWPA, ordered Jewett to pay $665,978.60, while Jewett argued that restitution should have been limited to $68,978.60, the amount of the two checks specified in the two counts to which he pled guilty. Similarly, in the case at issue, the sentencing court ordered defendant to pay the full amount received from Aetna. Defendant contends that he should only have to pay restitution in the amount of the check from Aetna specified in Count 8 to which he was found guilty.[8]

In *Jewett*, as in this case, the government urged the court to adopt the position taken by the Seventh Circuit. Namely, that "[p]roof of a scheme is an element of the offense of mail fraud, and therefore, actions pursuant to that scheme should be considered 'conduct that is the basis of the offense of conviction.'" *United States v. Bennett*, 943 F.2d 738, 740 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2970, 119 L.Ed.2d 590 (1992). In rejecting this argument, this Court stated that:

> [T]he fact that an offense requires, as an essential element, the existence of a scheme to defraud "is too fine a point on which to distinguish *Hughey*...." In this case, we believe the "specific conduct that is the basis of the offense of conviction," *Hughey*, 495 U.S. at 413, 110 S.Ct. at 1981, can only reasonably refer to the two mailings which serve as the bases for Jewett's convictions, and that the losses attributable to the particular mailings specified in Count I and II "establish[ ] the outer limits of [the] restitution order." *Id.* at 420, 110 S.Ct. at 1984. ... The offense of mail fraud describes the use of the mails for the purpose of executing a scheme to defraud, and it is that specific conduct, and the losses caused by it, that establishes the scope of

the district court's authority in ordering restitution under the VWPA. *Acts other than the particular mailing described in a count of conviction, even when committed during the course of or in furtherance of the same fraudulent scheme, do not state independent "offenses of conviction."* A restitution order encompassing losses attributable to these acts is, therefore, beyond the scope of a sentencing court's authority to order restitution to "any victim of [an] offense." 18 U.S.C. § 3663(a)(1).

The "specific conduct" for which defendant Jewett was convicted was mail fraud, not executing a fraudulent scheme. The existence of a scheme to defraud Ford of over $650,000 does not, and cannot, alter the statutory command that restitution under the VWPA be limited to "victim[s] of [the] offense" of conviction. In this case, the offenses of conviction were the two uses of the mail in the execution of a scheme to defraud Ford. The district court, in ordering restitution based on all losses caused by defendant Jewett's scheme to defraud rather than those attributable to the specific mailings for which Jewett was charged and convicted in Counts I and II, exceeded its statutory authority under 18 U.S.C. § 3663(a)(1).

*Jewett*, 978 F.2d at 251–52 (citations omitted; emphasis added). Applying *Jewett*, the offense of conviction was the one use of the mail, set forth in Count 8, in the execution of defendant's scheme to defraud Aetna. Consequently, the District Court should have ordered defendant to pay Aetna only the $915.61 charged in Count 8.

■ The amendments to the VWPA, which became effective November 29, 1990, do not alter this decision. In pertinent part, the VWPA now provides:

> For the purposes of restitution, a victim of an offense that involves as an element a scheme, a conspiracy, or a pattern of criminal activity means any person di-

---

8. Count 8 refers to an Aetna draft dated March 31, 1988 (and mailed to defendant) in the amount of $915.61. Counts 9, 11, and 12 pertain to social security disability benefits dated April 21, 1988, in the amount of $2,644.00; March 3, 1989, in the amount of $687.00; and September 1, 1989, in the amount of $687.00, respectively. Recovery for the latter three checks is subsumed within the $14,115.00 restitution award for the false statement convictions.

rectly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663(a)(2). While "[t]his amended subsection expands the definition of a 'victim' in cases such as mail fraud, and, if applicable, would appear to authorize restitution in this case for all losses attributable to [Streebing's] scheme to defraud [Aetna]," *Jewett,* 978 F.2d at 252, retroactive application of this provision in this case would violate the constitutional prohibition of *ex post facto* laws. *Id.*

This Court has already interpreted the amended section 3663(a)(2) as "a change in law, superseding the Supreme Court's decision in *Hughey,* adopting a broader definition of 'victim,' and expanding the scope of restitution which may be ordered for offenses involving 'as an element a scheme, a conspiracy, or a pattern of criminal activity....'" *Id.* at 253. Because the amended 18 U.S.C. § 3663(a)(2) took effect after defendant committed the mail fraud offenses for which he was convicted, and increased the applicable penalties for those crimes, it constitutes an *ex post facto* law as applied to the facts of this case. *Id.* Retroactive application of this specific provision is thus constitutionally prohibited and although it was in effect at the time of defendant's conviction (November 11, 1991) and sentencing (January 24, 1992), it cannot be legally enforced against him for acts committed prior to November 29, 1990. *Id.* Consequently, under this Court's holding in *Jewett,* restitution to Aetna is limited to the loss caused by the mailing for which defendant was convicted, *i.e.,* the $915.61 listed in Count 8.

### IV.

For the aforementioned reasons, defendant's convictions are AFFIRMED, the restitution component of the sentence is VACATED in part, and this case REMANDED for resentencing in accordance with this opinion.