**UNITED STATES of America,**

v.

**Xavier HOLLEY, Defendant.**

**Criminal No. 2:11cr73–3.**

United States District Court,
E.D. Virginia,
Norfolk Division.

March 22, 2012.

**624**

Benjamin L. Hatch, V. Kathleen Dougherty, United States Attorneys Office, Norfolk, VA, for Plaintiffs.

Andrew A. Protogyrou, Esquire, Norfolk, VA, Melinda R.S. Glaubke, Esquire, Virginia Beach, VA, for Defendant.

## MEMORANDUM OPINION

REBECCA BEACH SMITH, Chief Judge.

This matter is before the court on Defendant's Motion to Dismiss Indictment or in the Alternative to Suppress Evidence ("Motion to Dismiss") and Defendant's Motion for Severance ("Motion for Severance"), each filed on January 17, 2012. The government filed responses in opposition on January 30, 2012. The court held a hearing on these motions on February 27, 2012, and took the matter under advisement.[1] After further review of the evidence that was presented at the hearing, and for the reasons set forth below, the court **DENIES** defendant's Motion to Dismiss and Motion for Severance.

### I. *Factual Background*

Xavier Holley was indicted on May 4, 2011, along with co-defendants Montarius Murry, Kevin Stevens, Jr., and Raneisha Sifford. The Indictment charged the defendant with Conspiracy to Interfere with Commerce by Violence, in violation of 18 U.S.C. § 1951; Attempt to Interfere with Commerce by Robbery, in violation of 18 U.S.C. §§ 1951 and 2; and Use of a Firearm Causing Death During a Violent Crime, in violation of 18 U.S.C. §§ 924(c)(1)(A), (j)(1), and 2.[2] On December 17, 2011, the government filed a five-count Superseding Indictment, naming the defendant along with Kevin Stevens, Jr., and Ronald Gober, II. In addition to re-alleging the previous three charges, the Superseding Indictment also charged the defendant with Use and Carry of a Firearm During a Violent Crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2; and a second count of Attempt to Interfere with Commerce by Robbery, in violation of 18 U.S.C. §§ 1951 and 2.[3] The allegations stem from the attempted robbery of the Gold Shop in Portsmouth, Virginia, on October 6, 2010, which resulted in the murder of Robert Nelson. *See* Superseding Indictment 2–6.

Portsmouth Homicide Detective Mark Luck was assigned as lead detective of the Gold Shop investigation. On November 10, 2010, he and his partner, Detective Ralph Ferrell, first interviewed Xavier Holley as part of the investigation at the state circuit court in Portsmouth, Virginia.[4]

---

1. The court also heard argument on, and denied, co-defendant Kevin Steven's Motion to Dismiss for Lack of Jurisdiction. Counsel for both defendants informed the court that the discovery issues presented in the remaining motions had been resolved.

2. Raniesha Sifford pled guilty on August 15, 2011, *see* ECF No. 74, and Montarius Murry

pled guilty on October 21, 2011, *see* ECF No. 101.

3. Ronald Gober, II pled guilty on January 18, 2012. *See* ECF No. 154.

4. Defendant was at court on another matter unrelated to this case.

The detectives had received information that the defendant had supplied the gun used in the crime in this case. The defendant agreed to be interviewed and was informed of his right to leave the interview at any time. Gov't Ex. 1, 2:26–2:55.[5] The detectives asked the defendant if he knew anything about the gun or the Gold Shop murder, but the defendant consistently denied any knowledge of the crime other than what he had seen on the news. *See, e.g., id.* at 33:13–33:18. The detectives repeatedly emphasized that their primary interest was in the weapon, stating: "I want the gun. I don't care how we get it, I want the gun." *Id.* at 26:20–26:25. At one point, Detective Ferrell asked the defendant: "If we can make the burglary charges go away, and the marijuana charges go away, and not charge you with anything else, you walk away a free man, will you give us the gun?" *Id.* at 32:59–33:10. The detectives also told the defendant that they would believe him, if he said he did not know that the robbery was going to occur. *See, e.g., id.* at 24:57–25:05. The defendant continued to disavow any knowledge of the gun or the other alleged participants in the crime through the duration of the interview.

Over the next several months, the defendant had repeated interactions with the Portsmouth Police Department, as well as federal authorities, concerning this case.[6] Sometime in late January or early February of 2011, Portsmouth Detective James Lowe[7] arranged a meeting, along with his partner Detective Hall, with the defendant. At this meeting, Detective Lowe told the defendant that the case could become a federal one. The defendant then indicated that he wanted an FBI agent present for the discussion, so the meeting was terminated.

On February 25, 2011, the defendant, along with his mother, Deborah Holley, his father, Benjamin Perry, and a family friend, Twe Sisco, met with Detective Luck, Detective Lowe, and FBI Special Agent Wendell Cosenza in the break room of an office building in Portsmouth, Virginia, that houses both the Portsmouth Commonwealth Attorney and some units of the Portsmouth Police Department.[8] Special Assistant United States Attorney ("SAUSA") Elizabeth Fitzwater[9] participated in a portion of the meeting via speakerphone. The defendant was informed that he would be offered a proffer letter governing the terms of his cooperation, but the physical letter was not provided to him at that time. The defendant indicated that he wanted to obtain counsel, and the meeting adjourned with the understanding he would do so. Afterward, the defendant did have a free consultation with an attorney, Richard

---

5. Government's Exhibit 1 is an approximately 55 minute audio and video recording of the defendant's November 10, 2010, interview, which recording the court has fully reviewed.

6. The exact number is unclear. For example, the defendant's mother, Deborah Holley, testified that she accompanied the defendant to approximately ten meetings, and for a period of weeks the police called almost every day. However, only two specific meetings involving the defendant and various state and federal officers were conclusively established between November of 2010 and March of 2011. No testimony was presented to indicate that any meetings occurred in which the defen-

dant's participation was involuntary. These intermediary meetings were not recorded or memorialized in police reports, or by the defendant or his mother in any way.

7. Detective Lowe also commonly goes by the moniker "J. Lowe."

8. The office building is located on the corner of London Street and Crawford Street and also had a Wachovia Bank branch in it at the time.

9. SAUSA Elizabeth Fitzwater was tragically killed in a car accident on September 5, 2011.

Davis, from the law firm Kozak & Associates, P.C., but did not retain him. SAUSA Fitzwater actually sent Mr. Davis a copy of the proffer letter at issue in the case, after the consultation. *See* Gov't Ex. 3.

On March 3, 2011, the defendant, his mother, father, and Twe Sisco voluntarily went to the Walter E. Hoffman United States Courthouse in Norfolk, Virginia, for a meeting with SAUSA Fitzwater, Special Agent Cosenza, Detective Luck, and Detective Lowe. The defendant's father was unable to enter the courthouse because he did not have any identification. The defendant was not detained or placed in custody at any time during the interview. The defendant was given a copy of the proffer letter and allowed to review it for some period of time with his mother.[10] After this review, SAUSA Fitzwater read the letter aloud to the defendant, and asked him if he had any questions. The proffer letter states, in pertinent part, that:

> Second, except as provided below, in any prosecution brought by the United States against you, no statements or other information provided by you during the interview session will be admissible against you in the government's case-in-chief or at sentencing.

> Third, the United States will be permitted to make derivative use of, and pursue any investigative leads suggested by, any statements or information provided by you. Such derivative information can be used against you at any stage of any criminal or civil proceeding.
>
> . . . .
>
> Finally, your proffer is made in accordance with the understandings set forth herein. No promises, agreements or

understandings exist between the parties other than those set forth in this agreement, and no modification of this agreement will have effect unless executed in writing by the parties with the same formalities as in this agreement. Gov't Ex. 2, at 1–2.

At some point during this time period, the defendant's mother was asked to leave the room.[11] The defendant subsequently signed the proffer letter, attesting:

> I have read the foregoing agreement in its entirety. I have had an opportunity to discuss this matter with an attorney of my choosing and understand that I have the option to request the appointment of counsel if I cannot afford to hire counsel. I voluntarily and knowingly agree to the terms set forth and to proceed without counsel.

*Id.* at 2. The defendant then gave a statement indicating he had provided the gun used in the Gold Shop murder to Montarius Murry, unaware of its intended purpose. Def's Ex. 2, at 1. The defendant also admitted that he was in the car with co-defendants Ronald Gober, who was driving, Murry, and Kevin Stevens before and after they allegedly carried out the murder, but "was not aware of the robbery until he received a call that night and someone told him that STEVENS and MURRY were on the news." *Id.* at 2. The defendant said that after Murry and Stevens had returned to the vehicle, Murry stated, "Go go go." *Id.* The defendant denied having any further discussions with Murry or Stevens from the point Murry told Gober to "go" through the time of the March 3, 2011, interview. *Id.* The defendant believed that Stevens had the gun

---

**10.** The court heard conflicting testimony on the actual length of time, ranging from approximately ten minutes, according to Xavier Holley and Deborah Holley, to twenty to thirty minutes, according to Detective Luck.

**11.** The defendant is and was an adult at the time.

when he returned to the car, but was not sure how it was left in the car. *Id.* At the conclusion of the March 3, 2011, meeting, the defendant led Detectives Luck and Lowe to the storm drain in Portsmouth where he thought he had dumped the gun, either the day of or the day after the robbery; no gun was recovered. The detectives subsequently dropped the defendant off at home.

On March 9, 2011, the defendant was issued a subpoena to appear before a federal grand jury on April 6, 2011. *See* Gov't Ex. 4. The defendant was never actually called to testify before the grand jury. The defendant did receive a $40 check, which he understood to relate to his appearance at the March 3, 2011, meeting at the federal courthouse, but this was not conclusively established at the hearing.[12] Defendant was eventually indicted in this case on May 4, 2011.

## II. *Motion to Dismiss*

The defendant pursues three main theories in arguing for dismissal or suppression of evidence. First, he argues that the government granted transactional immunity during the course of its conduct and interactions with him, starting at his interview on November 10, 2010, through his actual cooperation on March 3, 2011. *See* Mot. to Dismiss 5–7. Alternatively, the defendant argues that the proffer letter he signed on March 3, 2011, is an illusory promise and thus should be substituted for a grant of transactional immunity. *See id.* at 7–8. Finally, the defendant argues that even if the proffer letter is valid and the government did not grant transactional immunity, the government promised the defendant that he would not be charged, a false promise which rises to the level of coercion and thus renders his statements involuntary. *See id.* at 9–10.

---

12. All parties agreed that $40 is the standard fee paid to witnesses called to appear before the federal grand jury.

## A. No Informal Grant of Transactional Immunity

The defendant argues first that the government's conduct, starting with his interview on November 10, 2010, by Detectives Lowe and Ferrell, and continuing through the March 3, 2011, meeting with SAUSA Fitzwater, Special Agent Cosenza, and Detectives Luck and Lowe, constituted an informal grant of transactional immunity. *See* Mot. to Dismiss 5. During these interviews, as well as in the course of other interactions with SAUSA Fitzwater, Portsmouth police, and Special Agent Cosenza, the defendant alleges that the government repeatedly told him that if he cooperated with information about the gun at issue, he would not be charged in relation to his conduct. The defendant claims that by cooperating he accepted this informal offer of transactional immunity, and, therefore, the indictment should be dismissed. *See id.* at 5–6. The government, conversely, argues that no agreement was reached with the defendant in regard to immunity until the defendant signed the proffer letter on March 3, 2011, which granted only limited use immunity, and the defendant has never been granted transactional immunity. *See* Gov't Resp. to Mot. to Dismiss 2–3.

 "Agreements to exchange cooperation for transactional immunity are governed by traditional principles of contract law, and therefore may be express or implied." *United States v. McHan,* 101 F.3d 1027, 1034 (4th Cir.1996). An implied contract can come about when "the parties' conduct manifests their agreement." *Id.* Specifically, the court stated:

> Under the concept of "equitable immunity," moreover, courts may enforce informal grants of transactional immunity

where: (1) an agreement was made; (2) the defendant has performed on his side; and (3) the subsequent prosecution is directly related to offenses in which the defendant, pursuant to agreement, either assisted with the investigation or testified for the government. *Id.; see United States v. Flemmi,* 225 F.3d 78 (1st Cir.2000) ("[D]efendant ... must show both that the promisor had actual authority to make a particular promise and that he (the defendant) detrimentally relied on it."). Thus, to meet his burden, the defendant must show *"at least a meeting of the minds"* that the government would not prosecute him in exchange for his cooperation. *McHan,* 101 F.3d at 1034 (emphasis added). Defendant cannot do this.

Overall, the facts here are similar to *United States v. McClung,* No. 98–4587, 1999 WL 635644, 1999 U.S.App. LEXIS 19946 (4th Cir. Aug. 20, 1999) (unpublished per curiam). McClung claimed the government had agreed not to prosecute him in exchange for cooperation with a drug task force; the district court heard evidence that a meeting had taken place between the defendant and the charging authorities at which it was discussed that McClung's cooperation could be exchanged for federal charges not being filed. *Id.* at *1–2, 1999 U.S.App. LEXIS 19946 at *4. McClung subsequently signed a proffer letter at a later meeting, which granted him only limited use immunity. *Id.* The court held that the "terms of the proffer letter are patently inconsistent with an extrinsic, oral agreement not to prosecute," and therefore no agreement existed. *Id.* at *2, 1999 U.S.App. LEXIS 19946 at *5.

■ Here, as in *McClung,* the testimony presented is insufficient to meet the defendant's burden of showing that an oral agreement for transactional immunity existed. The video recording of the November 10, 2010, interview with Detectives Luck and Ferrell clearly demonstrates that *no agreement of any kind* was reached during that meeting. The detectives did repeatedly express that they were interested in the gun, not the defendant, and asked the defendant: *"If* we can make the burglary charges go away, and the marijuana charges go away, and not charge you with anything else, you walk away a free man, will you give us the gun?" Gov't Ex. 1, at 32:59–33:10. (emphasis added). However, the defendant was equally adamant in refusing to cooperate, stating: "I don't know nothing about [the] gun, or what they, or whatever they used, or anything." *Id.* at 33:10–33:14. The detectives then specifically warned the defendant that he faced serious charges, including possibly murder, if he did not cooperate. *See id.* at 33:22–34:11. It hardly seems necessary to state that the defendant cannot prove an agreement to exchange his cooperation for transactional immunity through evidence that shows he did not agree to cooperate in the first place.[13]

The defendant's evidence concerning subsequent interactions with the Portsmouth Police Department and Special Agent Cosenza similarly does not show any agreement. The defendant, by his own admission, repeatedly refused to cooperate or acknowledge any role in the offense before the March 3, 2011, meeting. Therefore, any evidence or testimony con-

---

**13.** This is not to say that the defendant would have received transactional immunity, if he had responded "Yes" to Detective Ferrell. Detective Luck testified that an affirmative response would have necessitated the involvement of Deputy Assistant Commonwealth Attorney Ed Feirria to work out the terms of any agreement for the defendant's cooperation. Further, the Portsmouth Police Department, on its own, does not have authority to bind the United States Attorney. *Cf. Flemmi,* 225 F.3d at 88.

cerning those meetings cannot demonstrate an informal agreement for transactional immunity.

Conversely, the government's request for the defendant to sign the proffer letter at the March 3, 2011, meeting, which clearly outlines limited use immunity, contradicts any interpretation that the government was offering an express or implied oral offer of transactional immunity. The letter clearly indicates that the "United States will be permitted to make derivative use of, and pursue any investigative leads suggested by, any statements or information provided by you. Such derivative information can be used against you at any stage of any criminal or civil proceeding." Gov't Exhibit 2, at 1. The defendant and Special Agent Cosenza each testified that SAUSA Fitzwater read the entire proffer letter out loud to the defendant. The defendant's assertion that the government actually thought it was willingly agreeing to transactional immunity, despite the clear language of the proffer letter and the express efforts of SAUSA Fitzwater, both at the February 25, 2011, meeting and the March 3, 2011, meeting, to inform the defendant about the proffer letter, is simply incongruous. The court has no doubt that on March 3, 2011, the defendant would have been willing to accept an offer of transactional immunity in exchange for his cooperation; however, the defendant has the burden of showing that the government *actually entered* such an agreement at the March 3, 2011, meeting, a burden he cannot carry.

The defendant did testify at the hearing on February 27, 2012, that he asked at the March 3, 2011, meeting if he would be charged if he signed the proffer letter, and that Special Agent Cosenza responded that the defendant would not be charged so long as he told the truth.[14] Given that the alleged exchange between the defendant and Special Agent Cosenza was contemporaneous with the written and signed proffer letter, which contained clear language that the letter was the exclusive agreement between the parties,[15] this assertion is more properly addressed in the context of analyzing the defendant's allegation of a false promise.[16] Regardless, the defendant's testimony about the statement, which is the only piece of evidence in the record suggesting a "meeting of the minds" on transactional immunity at any point between the defendant and the government, and which stands in stark contradiction to the terms of the proffer letter and the other evidence before the court, falls far short of carrying defendant's burden.[17]

## B. Proffer Letter Is Not an Illusory Promise

■ The defendant's next argument is that the government's proffer letter constitutes an illusory promise. *See* Mot. to Dismiss 7.[18] An illusory promise does not obligate the promisor to do anything, and is therefore unenforceable. *See Elmore v. Cone Mills Corp.*, 23 F.3d 855, 870 (4th Cir.1994) (citing, for example, a promise for which performance by the promisor is

---

**14.** Other testimony contradicts the defendant's description. *See infra* at 632–33 (discussing the testimony of the other participants in the March 3, 2011, meeting).

**15.** *See* Gov't Ex. 2, at 2.

**16.** *See generally infra* Part II.C.

**17.** Needless to say, the court's credibility concerns with this testimony, detailed below in

its analysis of the defendant's claim of a false promise, *see infra* at 633, are equally applicable to its consideration of the statement here.

**18.** This argument was not raised at the February 27, 2012, hearing, so the court relies on the defendant's assertions in his Motion to Dismiss.

optional). The proffer letter states that the United States will not use the statements or information provided by the defendant against the defendant in its "case-in-chief or at sentencing," but it can "make derivative use of" such statements or information, as well as "pursue any investigative leads suggested by" the statements. Gov't Ex. 2, at 1. The defendant argues that the government's promise, without derivative use immunity, gives the government an unlimited ability to decide the nature or extent of its performance, making the proffer letter illusory and unenforceable. Mot. to Dismiss 7–8. As a result, the defendant asserts that his cooperation constitutes coerced testimony, and, accordingly, he should be given a constitutional entitlement of transactional immunity. *Id.* at 8.

 When the defendant *voluntarily* cooperates,[19] the government has great latitude over what sort of immunity to grant. *See United States v. Smith,* 452 F.3d 323, 337 (4th Cir.2006) (stating that when "the defendant has provided information voluntarily by agreement rather than by compulsion .... the government is not obligated to provide use or derivative use immunity, much less both").[20] Here, the government expressly agreed not to use any statements or information given by the defendant against him in its "case-in-chief or at sentencing," which is a form of limited use immunity, thereby constituting consideration for the defendant's promise to cooperate. The government

did not retain the unlimited right to decide when and whether to introduce the defendant's statements at all later proceedings; it is bound by its promise not to use the defendant's statement in its case-in-chief or at sentencing, and that promise is not illusory and is enforceable at this juncture.[21]

## C. Defendant's Cooperation Was Voluntary

The last argument offered by the defendant for suppression of evidence is that the government's conduct constituted a false promise of immunity, and therefore the defendant's incriminating statements must be suppressed because they were involuntary. *See* Mot. to Dismiss 9. In support, the defendant points to his repeated meetings and discussions with the Portsmouth detectives, Special Agent Cosenza, and SAUSA Fitzwater, at which he claims they repeatedly offered immunity in exchange for the location of the gun, and to the March 3, 2011 meeting, at which he alleges he was told he would not be prosecuted. *Id.* at 9–10. For its part, the government denies ever promising the defendant that he would not be charged in exchange for his cooperation. *See* Gov't Resp. to Mot. to Dismiss 12.

 Under 18 U.S.C. § 3501, the trial judge must make a preliminary determination that a confession was voluntarily given for it to be used in a criminal prosecution. The government has the burden of show-

---

**19.** *See infra* Part II.C.

**20.** In contrast, a defendant cannot be *compelled* to testify over an assertion of privilege under the Fifth Amendment for anything less than either transactional immunity or *both* use *and* derivative use immunity. *See Kastigar v. United States,* 406 U.S. 441, 453, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

**21.** The government asserts that the defendant provided materially false information in his

statement; therefore, the government may seek to utilize the statement in its case-in-chief. *See* Gov't Resp. to Mot. to Dismiss 14 n. 5. However, as the government recognizes, *see id.,* introduction of the defendant's statement would only be permitted after a separate motion by the government and a specific finding by the court that the defendant had violated the terms of the proffer letter. The government would bear the burden of proof on this issue.

ing that a confession is voluntary by a preponderance of the evidence. *See Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). In determining the voluntariness of a confession, the court should consider "all circumstances surrounding the giving of the confession," including, but not limited to, whether the defendant knew the nature of the offense with which he was charged, whether the defendant knew he did not have to make a statement and it could be used against him, whether the defendant was advised of his right to assistance of counsel, and whether defendant had assistance of counsel when questioned and when giving his confession. 18 U.S.C. § 3501(b).

 Case law provides further instruction on assessing voluntariness. "The test for determining whether a statement is voluntary under the Due Process Clause 'is whether the confession was extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" *United States v. Braxton,* 112 F.3d 777, 780 (4th Cir.1997) (quoting *Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976) (alterations in original)). Thus, "coercive police activity" is a "necessary predicate" to find a confession was involuntary. *Id.* In addition to the existence of such coercive police action, the defendant's will must be "overborne" or "his capacity for self-determination critically impaired." *United States v. Pelton,* 835 F.2d 1067, 1071 (4th Cir.1987). This determination must be made by examining the totality of the circumstances. *Id.*

 When a confession is induced by false promises of immunity from authorized agents of the government, a subsequent admission is involuntary and inadmissible. *See United States v. Gonzalez,* 736 F.2d 981, 982 (4th Cir.1984). "The perspective from which the statements

must be viewed is that of the defendant, not the prosecutor's." *Grades v. Boles,* 398 F.2d 409, 412 (4th Cir.1968). This does not mean that the court must find admissions involuntary every time a defendant subsequently asserts that he or she thought the government would not prosecute. For example, in *United States v. Pelton,* the Fourth Circuit held that statements by FBI agents that they would conduct a full scale investigation if the defendant did not cooperate, but that if he cooperated the agents would testify to his cooperation, and that not all investigations end in prosecutions, did not constitute a specific promise of leniency and could not have led to an involuntary confession, despite the defendant's stated interpretation of their statements. *Pelton,* 835 F.2d at 1073.

 Examining the totality of the circumstances, the evidence shows that the defendant's March 3, 2011, statement was voluntary. As a preliminary matter, the circumstances of that meeting, and those leading up to it, do not provide any support to a finding of involuntariness. It is uncontested that the defendant willingly attended the meetings, with members of his family and a friend present; was never placed in custody; and was free to refuse to cooperate or leave at any time. Further, it is clear the defendant was fully aware of these circumstances, as he in fact repeatedly refused to cooperate at meetings prior to March 3, 2011, and he concluded at least one of the meetings on his own volition because no FBI agent was present. Although the defendant was not represented by a lawyer at the March 3, 2011, meeting, he had been encouraged to retain counsel, and SAUSA Fitzwater had forwarded a copy of the proffer letter to Mr. Davis to facilitate any potential representation. Moreover, testimony demonstrated that the defendant was advised,

both through SAUSA Fitzwater's reading of the terms of the proffer letter and her offer to assist the defendant in obtaining court-appointed counsel, that he could be provided counsel, if he so desired. The defendant signed the proffer letter, attesting that he "voluntarily and knowingly agree[d] to the terms set forth and to proceed without counsel." Gov't Ex. 2, at 2.

The defendant alleges that despite all of these facts, his statement was involuntary because the government made a false promise that he would not be charged in exchange for his cooperation. Specifically, the defendant testified that at the February 25, 2011, meeting he was told by Special Agent Cosenza that if he signed the proffer letter he would not be charged. Further, after reviewing the letter on March 3, 2011, he asked if the letter meant he would not be charged, if he told the truth. The defendant testified that Special Agent Cosenza said that as long as the defendant told the truth, he would not be charged and would not have to worry about it. The defendant also testified that SAUSA Fitzwater nodded in agreement to this description.

The court simply cannot give credence to the defendant's version of these meetings, or his description of the government's actions. To start, it stands in stark contrast to the testimony of the alleged promisor, Special Agent Cosenza, whose testimony the court found credible throughout. Special Agent Cosenza testified that he first met the defendant at the February 25, 2011, meeting, and he tried to impress on the defendant the need to come forward with the truth before other codefendants in the case. Special Agent Cosenza stated he never told the defendant he would not be charged. Indeed, Special Agent Cosenza noted he did not have any authority to make such an offer, and he would not have made such an offer without knowing the defendant's level of involvement in the crime.

In regard to the March 3, 2011, meeting, Special Agent Cosenza stated the defendant was indeed worried about prosecution and wanted to know what would happen. However, Special Agent Cosenza stated *no promises* of any kind were made *outside of the terms of the proffer letter.* When the defendant asked about prosecution, he was told that the government did not know what the defendant was going to tell them, so they did not know what the outcome was going to be. Detective Luck, who was also present at the March 3, 2011, meeting, testified that no one present made any promises *beyond the terms of the proffer letter,* and that the defendant was never told he would not be charged.[22] As the defendant himself testified, SAUSA Fitzwater read the entire proffer letter aloud to make sure the terms of the agreement were clear. For his part, Detective Lowe did not recall any conversation between the defendant and Special Agent Cosenza or SAUSA Fitzwater.

The testimony of these three witnesses is further bolstered by the consistency of the behavior of the Portsmouth Police Department, the FBI, and the United States Attorney throughout all of their interactions with the defendant. The evidence presented clearly shows that the government repeatedly emphasized its desire to obtain the weapon in the case, but *never*

---

**22.** Detective Luck did recall the defendant asking a few questions of SAUSA Fitzwater about the proffer letter, but could not remember the precise focus of those inquiries. Such inquiries would accord with Special Agent Cosenza's testimony that the defendant ex- pressed concern about being prosecuted. However, both Detective Luck and Special Agent Cosenza definitively testified that no promises were made by anyone at the meetings, including SAUSA Fitzwater, about the prosecution of the defendant.

*promised anything* in exchange for the defendant's cooperation *outside of the proffer letter.* The recording of the November 10, 2010, interview between the defendant and Detectives Luck and Ferrell demonstrates that the detectives consistently focused on the gun, while never making any promises regarding any potential charges against the defendant. *See supra* at 3.[23] Indeed, the detectives warned the defendant about the full scope of the charges he potentially faced. *See* Gov't Ex. 1, at 33:22–34:11.

At the February 25, 2011, meeting, the proffer letter was discussed and SAUSA Fitzwater participated via speakerphone to attempt to clarify the meaning of the letter. Special Agent Cosenza testified that SAUSA Fitzwater told the defendant that the words he said would not be used against him, as long as he told the truth, when she was explaining the limited use immunity in the proffer letter. Defendant did not cooperate or reveal any information at that meeting. SAUSA Fitzwater then sent a copy of the proffer letter to Richard Davis; Mr. Davis testified at the February 27, 2012, hearing before this court that when he talked with SAUSA Fitzwater, she was interested in getting the gun, but he did not recall SAUSA Fitzwater specifying anything about charging or not charging the defendant. These facts all consistently point towards a governmental investigation focused around obtaining the gun used in the Gold Shop murder, which culminated in offering the defendant a proffer letter, and limited use immunity, for his cooperation.

In contrast to this consistent timeline and testimony, the defendant's testimony suffers from severe credibility issues. To start, the defendant alleges two self-serving exchanges that are not recalled by three other witnesses present at each of the February 25, 2011, and March 3, 2011, meetings, including the other alleged participant in the conversation, Special Agent Cosenza. Moreover, during the course of his testimony, the defendant affirmatively stated that he was completely truthful in both his November 10, 2010, interview with Detectives Luck and Ferrell, and his statement on March 3, 2011. Setting aside any consideration of the actual underlying truth about the defendant's involvement, the court has examined both the full recording of defendant's November 10, 2010, interview, and the FBI report summarizing the defendant's statements at the March 3, 2011, meeting; the defendant's assertions at the two meetings are utterly and diametrically in opposition to each other. This clear falsehood calls into question the truthfulness of the entirety of his testimony.

The *additional* evidence the defendant presented is equally unpersuasive. The defendant's mother, Deborah Holley, testified about both meetings, and the defendant proffered an affidavit of the defendant's father, Benjamin Perry.[24] Both were present at the February 25, 2011, meeting; however, only Deborah Holley claimed that someone said they would not bring charges against the defendant.[25] Benjamin Perry's proffered statement simply indicates that "the *Portsmouth Police*

---

23. *See also supra* note 13 (discussing the detectives' lack of authority to make any such promises).

24. Benjamin Perry did not testify at the motion hearing because again he did not have any identification to enter the federal court-

house. However, the court accepted his proffer letter, *see* Def's Ex. 1, but evaluates his contentions in light of the government's inability to carry out cross-examination, as well as Perry's absence from the March 3, 2011, meeting. *See infra* at 633–34.

25. *See supra* note 24.

reiterated that they did not want to prosecute Xavier," Def's Ex. 1, at 1 (emphasis added), which is not inconsistent with the government's witnesses, and certainly would not constitute a promise not to indict him.[26] Conversely, by her own admission, after reviewing the proffer letter with her son, Deborah Holley was asked to leave the room before the defendant signed the document on March 3, 2011. She, therefore, has no personal insight into the statement alleged at that meeting. Similarly, Mr. Perry's proffered statement says that he was denied entrance to the courthouse on March 3, 2011, so he too was not present for the relevant alleged exchange.

In short, the court finds the government's evidence credible and sufficient to demonstrate that the defendant's statement was voluntarily given in exchange for the proffer letter's offer of limited use immunity.

**D. Summary**

As detailed above, the court does not find merit in any of the defendant's arguments for dismissing the indictment or suppressing the defendant's statement about the gun and robbery, except to the extent that, under the terms of the proffer letter, the statement cannot be used in the government's case-in-chief or at sentencing at this juncture.[27] Therefore, the defendant's Motion to Dismiss is **DENIED.**

**III. *Motion for Severance***

The defendant claims that severance is appropriate because there may be prejudice from admitted evidence of other co-defendants' crimes, as well as potential issues with co-defendant confessions under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *See* Mot. for Severance 2–3. Conversely, the

government argues that to the extent the defendant has actually alleged any prejudice, it is general and unspecified, and severance should be denied. *See* Gov't Resp. to Mot. for Severance 1–2.

Joinder of the defendants in this case is appropriate under Federal Rule of Criminal Procedure 8(b), which states: "The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Moreover, "[j]oint trials are favored in those cases in which defendants have been indicted together for the sake of judicial economy." *United States v. Reavis,* 48 F.3d 763, 767 (4th Cir.1995). Counsel for the defendant indicated at the motion hearing that the defense currently plans on calling co-defendant Kevin Stevens. However, such an assertion is insufficient evidence of any requisite actual prejudice that will be suffered as a result of a joint trial. *See Reavis,* 48 F.3d at 767 ("A defendant's attempt to have her trial severed from that of a co-defendant is far less likely to succeed when the request is based on the asserted need for a co-defendant's testimony."). Should potential issues arise at trial, the court will take the appropriate steps at that time to avoid any prejudice to the defendant. *See, e.g., United States v. Vogt,* 910 F.2d 1184, 1191–92 (4th Cir.1990) (approving of redaction of names or insertion of pronouns to avoid issues with co-defendant confessions under *Bruton*). However, given that there has been no showing at this time that actual prejudice will result from a joint trial, the defendant's Motion for Severance is **DENIED.**

---

**26.** *See also supra* note 13 (discussing the Portsmouth Police Department's inability to bind the United States Attorney).

**27.** *See supra* note 21.

## IV. *Conclusion*

For the foregoing reasons, the court **DENIES** the defendant's Motion to Dismiss and Motion for Severance. The Clerk is **DIRECTED** to send copies of this Memorandum Opinion to counsel for the parties. The parties are **DIRECTED** to schedule a trial date with the Calendar Clerk within ten (10) days of the entry of this Memorandum Opinion.

**IT IS SO ORDERED.**