FILED
United States Court of Appeals
Tenth Circuit

**January 19, 2016**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JANET LEA LILLY,

Defendant-Appellant.

No. 14-8041

---

**Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 1:13-CR-00286-SWS-1)**

---

W. Keith Goody, Cougar, Washington, for Defendant-Appellant.

Thomas Szott, Assistant United States Attorney (Christopher A. Crofts, United States Attorney, with him on the brief), Office of the United States Attorney, District of Wyoming, Cheyenne, Wyoming, for Plaintiff-Appellee.

---

Before **BRISCOE**, **HOLMES**, and **BACHARACH**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

After federal investigative agents from the United States Drug Enforcement Administration ("DEA") arrested her fiancé with a quarter pound of methamphetamine, Defendant-Appellant Janet Lilly was contacted by

investigative agents from the Wyoming Division of Criminal Investigation ("DCI"). She made several incriminating statements to the DCI agents about her involvement in distributing methamphetamine. The agents suggested that it would be beneficial to her to cooperate, and she ultimately agreed to serve as a confidential informant. Approximately eighteen months later, she was nevertheless indicted for conspiracy to distribute methamphetamine in violation of federal law. Believing that the investigative agents had promised her federal immunity from prosecution, Ms. Lilly filed a motion seeking to prevent the United States from prosecuting her. The district court denied her motion, finding that neither the DCI nor the DEA had the authority to bind the United States to any such agreement. Ms. Lilly entered a conditional guilty plea, and now appeals from the district court's denial of her motion. Exercising our jurisdiction under 28 U.S.C. § 1291, we **affirm**.

## I

DEA agents arrested Tim Thomas, Ms. Lilly's fiancé, with approximately a quarter pound of methamphetamine on November 21, 2011. The DEA agents then called DCI special agent Chris McDonald and asked him to check the registration of Mr. Thomas's vehicle. The vehicle's registration indicated that Mr. Thomas resided at an address that Agent McDonald believed to be Ms. Lilly's home. Agent McDonald reported to the DEA agents that he had previously received information that Ms. Lilly was distributing methamphetamine; the DEA then

2

asked him to interview her. The DEA agents also called Ms. Lilly to notify her that Mr. Thomas had been arrested and that DCI agents "would be coming to talk to" her. Aplt. App. at 172 (Tr. Mot. Hr'g, dated Feb. 21, 2014). She testified that the DEA told her that "it would be in [Mr. Thomas's] best interest if [she] cooperated." *Id.*

That same afternoon Agent McDonald and another DCI agent interviewed Ms. Lilly at her home. During the twenty-minute meeting, she made numerous incriminating statements directly implicating herself in the distribution of methamphetamine, including discussing prices, frequency of distribution, and the quantities in which she dealt, and revealing the identities of some of her associates. She acknowledged that "saying all of this to [the DCI agents] [was] an admission of guilt," Aplee. App., Vol. II, at 6:28–6:30 (Audio Recording of Nov. 21, 2011 Interview), and they responded that it was "going to help" and that they were "trying to minimize the damage to [her]," *id.* at 6:37–6:42. When she asked if she would be arrested for her actions, the DCI agents told her that they could not make any promises, but that "if [she] cooperate[d] and help[ed] out, that'd go a long ways." *Id.* at 4:22–4:27.

The following day, November 22, 2011, Ms. Lilly met with DEA agents. The DEA agents asked Ms. Lilly questions about the sources of her methamphetamine; the possibility that she would not be prosecuted as a result of

3

her cooperation, however, was not discussed.  It does not appear that any DCI agents were present at this meeting.

Next, on December 12, 2011, Ms. Lilly met with Agent McDonald and another DCI agent.  At this meeting, she continued to provide information about her contacts and local distributors and sent several messages to her source in Colorado.  Agent McDonald was "sure" they discussed the possibility of her cooperation, but denied promising her immunity from prosecution, Aplt. App. at 119; according to Ms. Lilly, she was informed "that the more [she] helped them, the more they would be able to help [her]," *id.* at 181.  She claims that the DCI agents told her that they were going to treat the interview "as a proffer," which she understood to mean that "anything that [they talked about] wasn't going to be used." *Id.* at 183.  Nevertheless, Ms. Lilly began to have qualms about speaking with the DCI agents and engaged an attorney to represent her.

Ms. Lilly, her lawyer, and the DCI agents again met in late December 2011.  Ms. Lilly signed an agreement to work as a confidential informant, and provided further details about her sources and distribution network.[1]  While the DCI agents again stated that they were amenable to treating the interview as a "proffer," *id.* at 137, it does not appear that they explicitly promised that she would not face federal prosecution.  Indeed, the confidential-informant agreement indicated that

---

[1]     Between December 2011 and at least May 2012, Ms. Lilly worked as a confidential informant, conducting controlled buys and assisting with the execution of a search warrant.

4

the agency could "make only recommendations" regarding whether any potential charges against her should be reduced. Aplee. App., Vol. III, at 4 (Confidential Informant Agreement, dated Dec. 30, 2011) (emphasis omitted). Ms. Lilly agreed that the agents never explicitly promised that she would not be prosecuted, but that it "was just somewhat implied." Aplt. App. at 193.

Her attorney also admitted that there was no formal non-prosecution agreement. He had worked with Agent McDonald in the past, "trust[ed] [him] implicitly," *id.* at 165, and believed "there was kind of an implied 'wink and a nod'" that if Ms. Lilly cooperated she would not "have to be looking over [her] shoulder with the feds," *id.* at 166. He conceded that the United States Attorney's Office for the District of Wyoming was not involved in the discussions. Ultimately, he did not remember any "specific conversation," "written communication," or "specific reason" why he advised Ms. Lilly to answer the DCI agents' questions, *id.* at 168; her counsel was apparently guided by his implicit "impression that there would not be federal charges coming," *id.* at 156.

But federal charges did come. On November 20, 2013, a grand jury indicted Ms. Lilly on one count of conspiracy to possess with intent to distribute, and to distribute, methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. The indictment alleged that the conspiracy occurred between January 2010 and April 2013. Believing that she had been promised immunity from federal prosecution, Ms. Lilly filed a "Motion to Enforce

5

Agreement of the United States to Not Prosecute the Defendant and Motion in Limine." *Id.* at 12 (Mot., filed Feb. 4, 2014) (capitalization altered). The district court denied the motion after a hearing, concluding that regardless of whether Ms. Lilly was promised immunity, "the evidence fail[ed] to establish any actual authority on the part of the DCI agents to grant" any immunity, *id*. at 270 (Tr. Telephonic Oral Ruling, dated Feb. 24, 2014), and even if "the DEA agents were somehow giving authority to DCI to negotiate immunity on their behalf," there was still no evidence "to support that the DEA agents had the authority to do so," *id.* at 267.

Ms. Lilly then entered a conditional guilty plea and reserved her right to appeal, *inter alia*, the district court's denial of her motion to enforce the alleged non-prosecution agreement. Ms. Lilly was sentenced, pursuant to a plea agreement, to eighty-seven months' imprisonment and four years of supervised release. This timely appeal followed.

**II**

On appeal, Ms. Lilly claims that she had an agreement with the "United States that she would not be prosecuted for her criminal conduct occurring between January 10, 2010 and November 21, 2011[,] and anything she said during her proffer would not be used against her." Aplt. Opening Br. at 5. This contention has both a factual dimension—namely, whether the DCI or DEA agents actually promised Ms. Lilly federal prosecutorial immunity—and a legal

6

dimension—whether the DCI or DEA agents had the authority to promise such immunity. We focus on the latter aspect of Ms. Lilly's argument; more specifically, we assume *arguendo* that Ms. Lilly has demonstrated the factual aspect—*viz.*, that either the DCI or the DEA agents promised her immunity from federal prosecution—and turn our inquiry to whether either group of agents had the legal authority to enter into such an agreement on behalf of the United States. "This is a pure issue of law, which we review de novo." *United States v. Ellis*, 527 F.3d 203, 205 (1st Cir. 2008). As we explain below, neither agency had the authority to promise Ms. Lilly federal immunity, and thus any purported agreement is unenforceable against the United States.

### A

In a seminal Supreme Court case that is perhaps most central to the resolution of Ms. Lilly's appeal, almost seventy years ago, Justice Frankfurter wrote:

> Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority.

*Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947); *cf. Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 420 (1990) (describing *Merrill* as "the leading

7

case in our modern line of estoppel decisions"). Currently, "[i]t is well established that the federal government will not be bound by a contract or agreement entered into by one of its agents unless such agent is acting within the limits of his actual authority." *Dresser Indus., Inc. v. United States*, 596 F.2d 1231, 1236 (5th Cir. 1979); *see, e.g.*, *Ellis*, 527 F.3d at 207 ("When a private party seeks performance of a promise allegedly made by the government, it must show that the government representative alleged to have entered into the agreement had actual authority to bind the United States."); *Saulque v. United States*, 663 F.2d 968, 974 (9th Cir. 1981) ("[O]ne who relies on the act of a government agent must show that the agent acted within his authority."); *Hicks v. Harris*, 606 F.2d 65, 68 (5th Cir. 1979) ("[T]hose dealing with an agent of the United States must be held to have had notice of the limitation of his authority." (alteration in original) (quoting *Wilber Nat'l Bank of Oneonta v. United States*, 294 U.S. 120, 123–24 (1935))).

"[D]octrines such as estoppel and apparent authority are not available to bind the federal sovereign." *Ellis*, 527 F.3d at 208 (quoting *United States v. Flemmi*, 225 F.3d 78, 85 (1st Cir. 2000)); *accord Thomas v. INS*, 35 F.3d 1332, 1338 (9th Cir. 1994). *But see* Restatement (Third) of Agency § 1.01 cmt. c (Am. Law Inst. 2006) (stating, as a general matter (outside of the governmental context), that "Actual authority does not exhaust the circumstances under which the legal consequences of one person's actions may be attributed to another

8

person.  An agent also has power to affect the principal's legal relations through the operation of apparent authority . . . .").  Thus, "unless the agent had actual authority, any agreement is ineffectual."  *Urso v. United States*, 72 F.3d 59, 60 (7th Cir. 1995).

"Actual authority incorporates the concepts of express and implied authority."  *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1278 (10th Cir. 2000) (quoting *Zions First Nat'l Bank v. Clark Clinic Corp.*, 762 P.2d 1090, 1094–95 (Utah 1988)); *see Flemmi*, 225 F.3d at 85 ("Actual authority may be conferred either expressly or by necessary implication."); *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989) ("[I]mplied actual authority, like expressed actual authority, will suffice.").  Express actual authority to bind the federal government exists "if—and only if—the Constitution, a federal statute, or a duly promulgated regulation grants such authority in clear and unequivocal terms."  *Flemmi*, 225 F.3d at 85; *see also Merrill*, 332 U.S. at 385–86 (looking at a regulation to determine the limits of the Federal Crop Insurance Corporation's authority to insure the respondent's crops).  On the other hand, actual authority may be implied "when such authority is considered to be an integral part of the duties assigned to a [g]overnment employee."  *H. Landau & Co.*, 886 F.2d at 324 (alteration in original) (quoting J. Cibinic & R. Nash, *Formation of Government Contracts* 43 (1982)).  That is, the authority must be "incidental to some other express grant of authority."  *Thomas*, 35 F.3d at 1338; *see also Flemmi*, 225 F.3d

9

at 85 ("[I]n the case of a federal agent, authority to do an act may be implied when that act is integral to the tasks assigned to him or otherwise necessary for the due accomplishment of those tasks."). Because implied actual authority emanates from an agent's core competency, "the agent must first possess express actual authority in the subject area at question" before implied authority may be invoked. *Abrams v. Trunzo*, 129 F.3d 1174, 1179 (11th Cir. 1997).

As relevant here, "a defendant who seeks specifically to enforce a promise . . . contained in a plea agreement or a freestanding cooperation agreement, must show . . . that the promisor had actual authority to make the particular promise." *Flemmi*, 225 F.3d at 84; *see Thomas*, 35 F.3d at 1338 ("The rule requiring compliance by the government with promises made during plea bargaining and analogous contexts generally requires that the agent be authorized to make the promise."). The Fifth Circuit sagely observed the troubling implications of the counterfactual:

> If the rule were otherwise, a minor government functionary hidden in the recesses of an obscure department would have the power to prevent the prosecution of a most heinous criminal simply by promising immunity in return for the performance of some act which might benefit his department. Such a result could not be countenanced.

*Dresser Indus.*, 596 F.2d at 1236–37.

Ms. Lilly maintains that DCI agents promised her that she would not face federal prosecution in return for her cooperation. Alternatively, she argues that

10

"the DCI was acting through and under the direction of . . . the DEA." Aplt. Opening Br. at 13. Thus, to prevail, she must show that the DCI, acting independently or on behalf of the DEA, had the actual authority to bind the United States to a non-prosecution agreement either pursuant to "the Constitution, a federal statute, or a duly promulgated regulation," *Flemmi*, 225 F.3d at 85, or as an "integral part" of its duties, *H. Landau & Co.*, 886 F.2d at 324 (quoting J. Cibnic & R. Nash, *supra*, at 43).

**B**

The DCI is a division of the Wyoming State Attorney General's Office, *see* Wyo. Stat. § 9-1-611, charged with working in cooperation with "federal, state[,] and local law enforcement agencies . . . for the efficient investigation of criminal activity and swift apprehension of persons suspected of violating the criminal laws of th[e] state," *id.* § 9-1-616(a). It is clear that, as state officials acting independently, the DCI agents "are without authority to bind federal proceedings." *Johnson v. Lumpkin*, 769 F.2d 630, 634 (9th Cir. 1985); *accord United States v. Glauning*, 211 F.3d 1085, 1087 (8th Cir. 2000) ("[S]tate and local government officials have no power to bind the federal government.").

This rule is grounded in principles of sovereignty and prosecutorial discretion: "[t]he sovereign not offering immunity has the undeniable right to protect the integrity of its law enforcement prerogatives" and "[t]his right cannot be controlled, thwarted, or diminished by another sovereign granting immunity

11

from prosecution." *United States v. Barker*, 542 F.2d 479, 483 (8th Cir. 1976) (quoting *United States v. First W. State Bank*, 491 F.2d 780, 783 (8th Cir. 1974)); *see also United States v. Roberson*, 872 F.2d 597, 611 (5th Cir. 1989) ("If state agreements that immunize criminal defendants from state charges could bind federal prosecutors, state prosecutors would be able to usurp federal prosecutorial discretion."). And, in an analogous context of plea agreements, we have held that "the federal government is not bound by provisions of a state plea agreement . . . unless it was a party to the state proceedings." *United States v. Sells*, 477 F.3d 1226, 1234 (10th Cir. 2007); *see United States v. Padilla*, 589 F.2d 481, 484 (10th Cir. 1978) ("We are not persuaded . . . that the United States is bound by the plea bargain in the state court proceeding. The United States was not a party to the [state] prosecution and its power to enforce its criminal laws cannot be affected by any proceedings in the state court."); *see also United States v. Pinter*, 971 F.2d 554, 557 (10th Cir. 1992) (noting that "'[a] cooperation agreement is analogous to a plea bargain[,]' and therefore . . . the same analysis applies to both types of agreements" (alterations in original) (quoting *United States v. Carrillo*, 709 F.2d 35, 36 (9th Cir. 1983))).

The effect of these authorities here is patent: the DCI agents—acting independently—did not have the authority, as state officials, to bind the United States to any purported agreement with Ms. Lilly to secure her cooperation in exchange for immunity. That is, "even assuming there was an enforceable non-

12

prosecution agreement between [Ms. Lilly] and the [DCI agents], it does not bar the federal prosecution, because state and local officials have no power to bind the federal government." *United States v. Vinson*, 414 F.3d 924, 929 (8th Cir. 2005); *accord Glauning*, 211 F.3d at 1087; *United States v. Sparks*, 87 F.3d 276, 279 (9th Cir. 1996); *Roberson*, 872 F.2d at 611.

## C

However, as Ms. Lilly sees it, the United States *was* a party to the alleged agreement she struck with the DCI agents because the DCI was acting at the behest of the DEA, a federal agency. Even assuming this contention is true as a factual matter, Ms. Lilly still cannot demonstrate that the DEA, as a matter of law, had the actual authority (acting through the DCI) to grant her immunity from federal prosecution.

To begin, as to express actual authority, Ms. Lilly points to no federal statute or regulation authorizing DEA agents to grant immunity to cooperating informants. *See Flemmi*, 225 F.3d at 85. Further, regarding implied actual authority, while the DEA has "broad powers to investigate violations of federal drug laws," *United States v. Moffett*, 84 F.3d 1291, 1293 (10th Cir. 1996), "the power to investigate does not necessarily encompass (or even reasonably imply) the power to grant . . . immunity," *Flemmi*, 225 F.3d at 87. As *Flemmi* observed, "the test is not whether such a power might from time to time prove advantageous, but, rather, whether such a power usually accompanies, is integral

13

to, or is reasonably necessary for the due performance of the task." *Id.* at 86.

While granting immunity might be helpful to securing cooperation of witnesses and developing informants, "[g]iven the many other avenues that exist . . . (e.g., money, promises of good words at sentencing), we view the connection between a promise of immunity and the [DEA]'s duty to investigate crimes as far too attenuated" to establish that the DEA had implied actual authority to grant Ms. Lilly immunity. *Id*.

Indeed, in declining to enforce federal investigators' promises of immunity, or other forms of favorable disposition of potential criminal charges, several of our sister circuits have reasoned in like fashion regarding actual authority. Specifically, they have indicated that, ordinarily, there is nothing inherent in a federal investigator's role that actually authorizes the investigator to make such promises; instead, there must be a showing that the investigator has received permission or authorization from a governmental actor that actually possesses actual authority—notably, a federal prosecutor. *See, e.g.*, *United States v. McInnis*, 429 F.3d 1, 5–6 (1st Cir. 2005) ("The Marshal Service is an investigatory arm of the Department of Justice, not a prosecutorial agency. It lacks authority deriving from its investigatory role, even when operating in conjunction with probation officers, to make promises to suspects binding on the United States Attorney."); *Flemmi*, 225 F.3d at 87 (noting in declining to enforce Federal Bureau of Investigation ("FBI") promises, "the case law supports this

14

result and, at the same time, contradicts the district court's premise that officials having lesser authority over prosecutions than United States Attorneys, such as FBI agents, may bind the United States either to dismiss an indictment or to refrain from prosecution"); *United States v. Streebing*, 987 F.2d 368, 372–73 (6th Cir. 1993) (noting that "the agent must be authorized to make the promise" and that "the record is devoid of any evidence establishing that [the FBI agent] was authorized to make promises or representations to induce defendant's cooperation"); *see also United States v. Fuzer*, 18 F.3d 517, 520 (7th Cir. 1994) (noting that "[the defendant] is still not entitled to have his conviction vacated because the record contains no evidence that the [Bureau of Alcohol, Tobacco, and Firearms ("ATF")] agents promised [the defendant] that he would not be prosecuted in federal court or that the ATF agents were authorized to bind the United States Attorney even if they did make such a promise"); *cf. United States v. Hudson*, 609 F.2d 1326, 1329 (9th Cir. 1979) (declining to "suggest that federal agents as a matter of law may never bind the prosecution to promises made to criminal defendants," but specifically noting in refusing to enforce U.S. Secret Service agent's promise that "there was no allegation that the United States Attorney knew about the alleged promise or that such acts by [the Secret Service agent] were sanctioned by the prosecution").

Moreover, at least one circuit—the Eleventh—has expressly adopted this position in an analogous context with respect to the DEA; specifically, it

15

concluded that the DEA lacks the authority to bind the United States to terms of a purported plea agreement setting a maximum penalty. *United States v. Kettering*, 861 F.2d 675, 678 n.1 (11th Cir. 1988) (rejecting defendant's contention that DEA agent's "own belief that he possessed the authority to bind the prosecution to the five year incarceration maximum should bar the government from withdrawing from the plea proposal in the interests of fundamental fairness," because "the record evidence . . . reveals that the [federal prosecutor] never authorized the agent to accept a plea agreement").[2] Accordingly, we discern no legal foundation for Ms. Lilly's contention that the U.S. Attorney's Office for the District of Wyoming (the federal prosecutor's office at issue here) should be bound by any non-prosecution promise that the DEA allegedly allowed the DCI to make to her.

Ms. Lilly's contrary arguments are inapposite or otherwise unavailing. For example, she misguidedly relies on breach-of-plea-agreement jurisprudence from the Supreme Court and our court. In this regard, she notably discusses our decision in *United States v. Cooper*, 70 F.3d 563 (10th Cir. 1995). From *Cooper*,

---

[2] A panel of our court reached a similar conclusion in a persuasive nonprecedential decision. *See United States v. Hurst*, 166 F.3d 1222, 1999 WL 12977, at *3–4 (10th Cir. 1999) (unpublished table decision) (where a DEA agent supposedly made an oral plea agreement with the defendant, noting that "the person who allegedly made the promise to the defendant must have been authorized to do so" and that "[t]here [wa]s no evidence that [the federal prosecutor] authorized [the DEA agent] to orally close a deal with [the defendant]").

16

Ms. Lilly divines the proposition that, "[i]f the defendant proffers and undertakes activities which involve personal risk, such as in this case, the promise made by *the authorities*" must be honored. Aplt. Br. at 14 (emphasis added). However, Ms. Lilly's reading of *Cooper*'s holding—as well as that of similar breach-of-plea-agreement cases—is too broad. *Cooper*'s focus was not on ensuring that governmental agents of all stripes and classifications keep their promises but, instead, on enforcing the promissory fidelity of one specific class of governmental actors—*viz.*, those who are legally authorized to bind the United States in criminal-prosecution matters before the courts, namely, federal prosecutors. Indeed, the passage of *Cooper* upon which Ms. Lilly relies makes this patent: invoking the Supreme Court's landmark breach-of-plea-agreement precedent, *Santobello v. New York*, 404 U.S. 257 (1971), *Cooper* refers to "a promise or agreement of *the prosecutor*" that "can be said to be part of the inducement or consideration" and underscores that "such [a] promise must be fulfilled." *Cooper*, 70 F.3d at 565 (emphasis omitted) (quoting *Santobello*, 404 U.S. at 269).

In *Cooper*, there was no dispute that the class of governmental actors at issue (i.e., federal prosecutors) had the actual authority to make binding commitments for the United States regarding criminal prosecutions; our concern there was simply whether a member of that class had made a promise that was subject to enforcement. But here, the question of actual authority is front and

17

center.  *See Dresser Indus.*, 596 F.2d at 1237 n.4 ("This question of actual authority readily distinguishes the principal cases relied upon by Dresser. . . .  In *Santobello*, there was no question that the first prosecutor possessed actual authority to strike the bargain with the defendant, and the Court did not hesitate to order that the bargain be kept."); *cf. Hudson*, 609 F.2d at 1328 & n.3 (citing, among other cases, *Santobello*, and stating, "The federal courts have long been cognizant of the responsibility of *federal prosecutors* meticulously to fulfill their promises.  In the instant case, however, the issue is whether a federal agent not within the United States Attorney's office may bind the prosecution to promises made outside his authority."  (emphasis added) (footnote omitted)).  And the critical problem for Ms. Lilly in seeking to bind the United States to a non-prosecution promise is that she cannot identify any alleged governmental official who had the actual authority to make such a promise.  In particular, she cannot identify any participation by a federal prosecutor—who actually does possess such authority—in making a non-prosecution promise to her.  And, as we have noted, neither governmental agency that Ms. Lilly has identified as allegedly having a role in delivering a non-prosecution promise to her—i.e., the DCI or the DEA—independently possessed the actual authority to do so.  Accordingly, rather

18

than being "instructive," as Ms. Lilly contends, Aplt. Br. at 14, *Cooper* and similar breach-of-plea-agreement cases are inapposite.[3]

Ms. Lilly's fallback position involves a general appeal to fairness. She contends that the district court's ruling—that she was not the beneficiary of a binding immunity promise—"violates every principal of justice and fair dealing." Aplt. Br. at 15. Put succinctly, Ms. Lilly argues that the government "double crossed" her, and it should not be permitted to unfairly benefit from this wrongful conduct. *Id.* at 14. However, regardless of the "hardship" that may result, it is well established that "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained" the limits of an agent's authority. *Merrill*, 332 U.S. at 383–84; *accord Hicks*, 606 F.2d at 68. Ms. Lilly does not explain why general fairness considerations should trump this well-established

---

[3] Ms. Lilly is mistaken in seeking succor from a couple of district court decisions that apply the "framework" of the breach-of-plea-agreement cases to facts analogous to these because those cases elide the actual-authority distinction between federal prosecutors and government investigative agents when it comes to binding the United States regarding criminal-prosecution matters. *See In re Doe*, 410 F. Supp. 1163, 1166 (E.D. Mich. 1976) ("In this limited context the government may not rely upon distinctions between express, implied, and apparent authority among its agents in avoiding the effect of its promise. These distinctions have meaning for the legal technician, not for the layman dealing with the 'government' in his negotiations."); *see also United States v. Barrett*, 390 F. Supp. 1022, 1024 (D.S.C. 1975) ("There can be no distinction between promises made by prosecutors in the Attorney General's office and promises made by agents of the Drug Enforcement Administration."). We discern no legal basis for ignoring this actual-authority distinction, given the clear direction of *Merrill* and its progeny.

principle of *Merrill* and its offspring.  Furthermore, Ms. Lilly has not cited to any Tenth Circuit case where fairness considerations have been given this effect.

To be sure, we acknowledge that some of our sister circuits have recognized "[a] narrow exception to this rule [i.e., of actual authority] exists when the government's noncompliance with an unauthorized promise would render a prosecution fundamentally unfair."  *Flemmi*, 225 F.3d at 88 n.4.  As the Ninth Circuit has stated,

> In general, a promise made by a government employee other than the United States Attorney to recommend dismissal of an indictment cannot bind the United States Attorney.  An exception has been recognized where, although the United States Attorney was not a party to a cooperation agreement, breach of the agreement rendered a prosecution fundamentally unfair.

*United States v. Williams*, 780 F.2d 802, 803 (9th Cir. 1986) (per curiam); *see also United States v. Rodman*, 519 F.2d 1058, 1059–60 (1st Cir. 1975) (per curiam) (upholding dismissal of an indictment where defendant gave "substantial information, including self-incriminating statements" based on an unfulfilled promise from the Securities and Exchange Commission ("SEC") to recommend non-prosecution because "the unfairness to the [defendant] warranted dismissal"); *cf. United States v. Costello*, 750 F.2d 553, 554, 556 (7th Cir. 1984) (where defendant "contends that an incriminating statement he gave to agents of the [FBI] should have been suppressed at trial because he made the statement in contemplation of receiving statutory immunity," the court reasoned that "[h]ad the

20

Government sought appellant's cooperation knowing immunity was legally forbidden or had the Government acted without the good faith intent to obtain immunity, then appellant would have a colorable argument that fundamental fairness requires reversal of his conviction").[4]

We need not definitively opine here on the propriety of such a fundamental-fairness exception, because even assuming *arguendo* Ms. Lilly could avail herself of it, we would conclude that "[t]his case lies well outside the compass of that seldom-seen exception." *Flemmi*, 225 F.3d at 88 n.4. As characterized by the First Circuit in *Flemmi*, the exception is a "narrow" one. *Id.* We have no reason to doubt this, being cognizant of "the interpretive principle that exceptions to a general proposition should be construed narrowly." *First Nat'l Bank of Durango v. Woods* (*In re Woods*), 743 F.3d 689, 699 (10th Cir. 2014); *accord City of New York v. Beretta U.S.A Corp.*, 524 F.3d 384, 403 (2d Cir. 2008). However, for present purposes, the more important point is a related one: if the fundamental-

---

[4] The government contends that Ms. Lilly "has never asserted that this rare exception should apply in this case." Aplee. Br. at 28 n.11. Strictly speaking, this is correct; Ms. Lilly's briefing does not expressly invoke a fundamental-fairness exception. However, as discussed below, Ms. Lilly relies heavily to support her general fairness arguments on the First Circuit's decision in *Rodman*, and some courts seem to view *Rodman* as a salient example of the deployment of the fundamental-fairness exception. *See Williams*, 780 F.2d at 803 (citing and discussing *Rodman* in connection with its express analysis of the fundamental-fairness "exception"); *cf. Streebing*, 987 F.2d at 372 n.4, 373 (giving extended treatment to *Rodman*, but concluding that "the prosecution in the case at hand was not fundamentally unfair"). Accordingly, acting prudently and with an eye toward ensuring that Ms. Lilly undisputedly receives a full and fair hearing, we examine this exception here.

21

fairness exception is to truly operate as an *exception*—rather than as a nominal

exception that proverbially swallows the rule—it must exclude from its ambit the

mine-run (i.e., typical) case. *See, e.g.*, *First Nat'l Bank of Durango*, 743 F.3d at

699 ("Flowing from this interpretive principle—that we must construe exceptions

narrowly—is the related concept that exceptions must not be interpreted so

broadly as to swallow the rule."); *see also Cuomo v. Clearing House Ass'n*, 557

U.S. 519, 530 (2009) (eschewing certain reading of a statutory exception "or else

the exception would swallow the rule"). In this regard, we recognize that fairness

concerns may arise in many instances where governmental actors fail to honor

their promises. But, in order for the fundamental-fairness exception to truly

function as an *exception* to the rule stemming from *Merrill*—which generally

dictates that, if the governmental actor's promises are unauthorized, they will not

be enforceable—the exception must delimit its range of application to those cases

where the fairness concerns are especially acute or extraordinary and,

consequently, exclude the mine-run cases where the fairness concerns fall short of

this standard.

And, having thoroughly reviewed the pertinent caselaw, we must conclude

that, aside from perhaps one noteworthy factor that actually does not benefit her,

Ms. Lilly's case is patently mine-run. Like Ms. Lilly, the typical defendant in

this setting complains that investigators made unfulfilled promises that the

defendant would not be prosecuted or would receive other favorable treatment

22

relative to potential criminal charges if the defendant truthfully disclosed information regarding an investigation—including self-incriminating information—or actively assisted the investigators in efforts aimed at catching other possible criminals.  *See, e.g.*, *Flemmi*, 225 F.3d at 82; *Streebing*, 987 F.2d at 371; *Hudson*, 609 F.2d at 1328.  Accordingly, because Ms. Lilly's case is mine-run, it is not a suitable candidate for application of the fundamental-fairness exception.

In this regard, in *Flemmi*, the defendant alleged that the FBI agents assured him that, if he repeatedly assisted them in an audio-surveillance investigation of certain organized crime figures, that any incriminating statements by him that the surveillance captured would not be used against him.  *See Flemmi*, 225 F.3d at 82.  However, the First Circuit reversed the district court's judgment that those assurances should be enforced; in so doing, it concluded that the defendant's circumstances fell "well outside the compass" of the fundamental-fairness exception.  *Id.* at 88 n.4.  Ms. Lilly's alleged circumstances are certainly not significantly more troubling (if at all) than the *Flemmi* defendant's; thus, consistent with the First Circuit, we conclude that (assuming its propriety) the fundamental-fairness exception offers Ms. Lilly no aid.

As suggested, Ms. Lilly's case does appear to deviate in one notable respect from the typical pattern in the investigator-promise setting discussed here; however, regrettably for her, it does so in a way that arguably dilutes—not

23

strengthens—her claim to relief on fundamental-fairness grounds. Specifically, unlike many of the defendants in this context, Ms. Lilly had the benefit of counsel's advice before making at least some of her important decisions regarding how to respond to the investigators' alleged promises. Nevertheless, she still signed an agreement to work as a confidential informant and gave law enforcement additional details regarding her sources and distribution network. As we see it, generally speaking, a defendant's access to counsel will place the defendant in a comparatively better position than the mine-run defendant, for whom the fundamental-fairness exception is unavailing. And, at least arguably, Ms. Lilly was likewise better off. Consequently, as a logical matter, it follows that the one noteworthy deviation of Ms. Lilly's case from the mine-run does not benefit her.

In support of her fairness arguments, like the *Flemmi* defendant, Ms. Lilly "places particularly staunch reliance" on the First Circuit's decision in *Rodman*. *Flemmi*, 225 F.3d at 90. In summarizing the essential facts and holding of this earlier decision of its court (i.e., the First Circuit), *Flemmi* stated:

> In *Rodman*, we affirmed dismissal of an indictment where the defendant was induced to give statements to the Securities and Exchange Commission (SEC) by a promise that the SEC would strongly recommend to the United States Attorney that the defendant not be prosecuted, and the SEC not only failed to make the recommendation but was actively contemplating the preparation of a criminal reference report implicating the defendant.

225 F.3d at 90.

However, *Rodman* does not give us pause. Without belaboring the obvious, we begin by noting that the First Circuit's decision in *Rodman* is not binding precedent for us, and therefore does not oblige us to change course. Moreover, *Rodman* is not persuasive for at least two salient reasons. First, like the First Circuit's later decision, *Flemmi*, we consider *Rodman* distinguishable because the essence of the alleged fundamental unfairness there was that the governmental actor (i.e., the SEC), flagrantly and deceitfully reneged on a promise that it was fully empowered to fulfill—making a non-prosecution *recommendation* to the U.S. Attorney—whereas here neither the DCI nor the DEA was ever empowered to promise Ms. Lilly any form of immunity from prosecution. *See Flemmi*, 225 F.3d at 90 (noting that *Rodman* could be "easily distinguished" and that it was "at a considerable remove from the case at bar" because "[t]here is no hint that the unfulfilled promise in *Rodman* . . . was beyond the promisor's authority"); *see also Hudson*, 609 F.2d at 1329 n.4 (distinguishing *Rodman*, *inter alia*, because "[i]n that case, the promise which was unfulfilled, was within the power of the SEC").

And, second, in upholding the district court's ruling, *Rodman* relied upon the supervisory power of federal courts, *see, e.g.*, *Streebing*, 987 F.2d at 372 n.4 (in discussing *Rodman*, noting it "held the district court did not abuse its supervisory powers by dismissing the indictment for unfairness"); however, under

25

controlling precedent from the Supreme Court and our circuit, this pathway for relief is too narrow for Ms. Lilly to travel. Therefore, the substantive premise for *Rodman*'s holding (i.e., supervisory power) would not support a like outcome here.

More specifically, in *Rodman*, the court concluded: "In light of the failure of the SEC to comply with what the district court found to be its agreement, the district court's view that the unfairness to the [defendant] warranted dismissal of the indictment was not an abuse of the court's supervisory function." 519 F.2d at 1059–60. As support, *Rodman* cited two of the Supreme Court's seminal supervisory-power cases: *Mallory v. United States*, 354 U.S. 449 (1959) and *McNabb v. United States*, 318 U.S. 332 (1943).[5] *See Rodman*, 519 F.2d at 1060. Since these two decisions, the Court has had occasion to explicate the central concerns of this power:

> "[G]uided by considerations of justice," and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress. The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before

[5] In *Corely v. United States*, the Supreme Court recognized that the so-called *McNabb-Mallory* rule "under which an arrested person's confession is inadmissible if given after an unreasonable delay in bringing him before a judge," was later limited by 18 U.S.C. § 3501(c). 556 U.S. 303, 306, 313–14 (2009). This subsequent history of the two cases has no appreciable impact on their standing as seminal examples of the Court's invocation of the supervisory power of federal courts.

26

the jury; and finally, as a remedy designed to deter illegal conduct . . . .

*United States v. Hasting*, 461 U.S. 499, 505 (1983) (alteration in original) (citations omitted) (quoting *McNabb*, 318 U.S. at 341); *see United States v. Payner*, 447 U.S. 727, 735 n.8 (1980) ("[W]e agree that the supervisory power serves the 'twofold' purpose of deterring illegality and protecting judicial integrity."); *see also McNabb*, 318 U.S. at 340 ("[T]he scope of our reviewing power over convictions brought here from the federal courts is not confined to ascertainment of Constitutional validity. Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence."). But the Court has "called for a restrained application of the supervisory power" and underscored that the power should be "applied with some caution." *Payner*, 447 U.S. at 734–35; *see Hasting*, 461 U.S. at 506–07 (noting that "reversals of convictions under the court's supervisory power must be approached 'with some caution,' and with a view toward balancing the interests involved" (citation omitted) (quoting *Payner*, 447 U.S. at 734)).

Our decisions have demonstrated scrupulous fidelity to the Court's restrained and circumspect approach to the exercise of the supervisory power. *See, e.g.*, *United States v. Gamble*, 737 F.2d 853, 859–60 (10th Cir. 1984) (though acknowledging that the government had "enmeshed in criminal schemes

27

fabricated entirely by government agents a black doctor who had no criminal record and with respect to whom the agents had no apparent hint of a predisposition to criminal activity," and had "with their elaborate machinations, sowed the seeds of criminality and brought defendant into their scheme," we concluded that "the breadth of the Supreme Court's language in" *Payner* "requires us to conclude . . . that we may not fashion a 'sub-constitutional' rule to permit dismissal of this case because of the government agents' conduct"); *see also United States v. Kilpatrick*, 821 F.2d 1456, 1475 (10th Cir. 1987) ("We remain convinced that the drastic remedy of dismissal of an indictment, whether premised on due process or supervisory powers theories, cannot be exercised without a *significant infringement* on the grand jury's ability to exercise independent judgment." (emphasis added)).

In light of this controlling precedent from the Supreme Court and our own court, we would be hard-pressed to conclude that the substantive premise for *Rodman*'s holding—i.e., supervisory power—could afford Ms. Lilly any relief. More specifically, Ms. Lilly has not demonstrated that we should enforce the investigators' alleged immunity promises to her under this narrowly circumscribed power because, as we have demonstrated, those alleged promises were, first and foremost, unauthorized, and thus our failure to enforce them would not implicate the integrity of the judiciary or violate Ms. Lilly's recognized rights; nor were the alleged promises tainted by any illegality. Consequently, for

28

this second reason as well, *Rodman* is unpersuasive and cannot guide our resolution of this case. Therefore, we reject in full Ms. Lilly's appeal to fairness.

In sum, without the United States Attorney's Office for the District of Wyoming's participation in, or authorization of, the DCI agents' alleged promises of immunity to Ms. Lilly, those promises are not enforceable against the United States. The DCI agents had no independent authority to bind the United States, and the DEA agents likewise lacked the authority to direct them to do so.[6]

### III

For the foregoing reasons, we **AFFIRM** the decision of the district court.

---

[6] We note one line of argument that Ms. Lilly has *not* pursued in contending that the agreement she allegedly reached should be binding on the United States. "In principle, the government may be bound by an unauthorized agreement if a properly authorized official subsequently ratifies it." *Flemmi*, 225 F.3d at 90; *accord Monarch Assurance P.L.C. v. United States*, 244 F.3d 1356, 1360 (Fed. Cir. 2001). Ms. Lilly does not allege that federal prosecutors here either expressly ratified the purported agreement, or, with knowledge of the grant of immunity, "fail[ed] to repudiate it in a timely manner, and accept[ed] benefits under it." *Flemmi*, 225 F.3d at 90. Therefore, we do not consider such an argument; by failing to raise it in her briefs, Ms. Lilly waived it. *See, e.g.*, *United States v. Cervini*, 379 F.3d 987, 994 n.5 (10th Cir. 2004) ("Arguments not raised by the parties in their briefs are deemed waived.").